United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MELANIE O'REILLY,

       Plaintiff,

   v.

VALLEY ENTERTAINMENT, INC., et al.,

       Defendants.

_____/

No. C-09-03580-CW (DMR)

**REPORT AND RECOMMENDATION RE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

Plaintiff, an Irish citizen and resident of California, is a recording artist and songwriter who has brought suit against Defendant St. Clair Entertainment Group[1] for copyright infringement of four of Plaintiff's musical works entitled "Annie Moore," "Oilean Draiochta," "Tir Na Mara," and "Mo Bhron Ar An Bhfarrage."  Docket No. 26 (Second Amended Complaint, hereinafter "SAC," ¶¶ 1, 12-21); Docket No. 39 (Declaration of Melanie O'Reilly in Support of Entry of Default Judgment, hereinafter "O'Reilly Decl.," ¶ 2).  Plaintiff filed a Motion for Default Judgment in which she seeks actual damages for copyright infringement.  The Court conducted a hearing on September 9, 2010.  Subsequently, Plaintiff submitted supplemental briefing and evidence in response to questions raised

---

[1]   Plaintiff originally filed suit against an additional entity, Valley Entertainment, Inc., which is no longer a party to this action, pursuant to the dismissal with prejudice of all claims for relief against Valley Entertainment.  As used throughout this opinion, "Defendant" refers to St. Clair Entertainment Group.

1   by the Court at oral argument. A further hearing was held on December 9, 2010. For the reasons set

2   forth herein, it is recommended that Plaintiff's Motion for Default be GRANTED.

3                                           **I. <u>BACKGROUND</u>**

4        On August 5, 2009, Plaintiff filed an action for copyright infringement under the Copyright

5   Act of 1976, 17 U.S.C. § 101, *et seq*. ("Copyright Act"). On November 10, 2009, Defendant was

6   personally served in Delaware with the summons and complaint. Docket No. 31 (Exh. A) ("Return

7   of Service"). On February 4, 2010, Plaintiff filed a SAC, which was also personally served on

8   Defendant. Docket No. 26 (SAC); Docket No. 33 (proof of service). The SAC did not assert new

9   claims for relief against Defendant.

10       In her SAC, Plaintiff alleges two causes of action against Defendant under the Copyright

11  Act, one for copyright infringement and the second for contributory infringement. Docket No. 26

12  (SAC ¶¶ 12-26). Plaintiff contends that each of the four musical works at issue in this action is

13  owned by her and registered to her in Ireland.[2] *Id.* (SAC ¶ 8); Docket No. 39 (O'Reilly Decl. ¶ 2).

14  Plaintiff further alleges that Defendant knew the four works were registered to Plaintiff but without

15  authorization, Defendant willfully copied, distributed, and/or publicly displayed Plaintiff's works.

16  Docket No. 26 (SAC ¶¶ 9, 11, 13-18). In support of her allegations, Plaintiff has submitted a

17  declaration attesting that Defendant wrongfully reproduced and distributed her works on seven

18  different musical albums. Docket No. 39 (O'Reilly Decl. ¶¶ 2-5). Plaintiff further attests that she

19  has retrieved data regarding sales of these albums in the United States from the music industry's

20  official sales tracking agency. *Id.* (O'Reilly Decl. ¶¶ 3-5). Finally, Plaintiff alleges that as a result of

─────────────────────────

22       [2]   Plaintiff uses the term "musical work" in her pleadings and supporting declarations . The
    Copyright Act does not define "musical work." *See* Jennifer L. Pridgeon, *The Performance Rights
    Act and American Participation in International Copyright Protection*, 17 J. Intell. Prop. L. 417, 420
    & n.13 (2010) ("musical work" includes the lyrics and notes of the song, as distinct from the actual
    recording of the song's performance; Congress did not define "musical work" in the Copyright Act
    due to "settled meaning" of the term). Plaintiff further attests that her works were recorded on an
    album. *See* Docket No. 54 (Second O'Reilly Supp. Decl. ¶ 2). Hence, Plaintiff's works are "sound
    recordings" under the Act. *See* 17 U.S.C. § 101 (defining "sounds recordings" as "works that result
    from the fixation of a series of musical, spoken, or other sounds... regardless of the nature of the
    material objects, such as disks, tapes, or other phonorecords, in which they are embodied").
    Whether Plaintiff's works are deemed "musical works" or  "sound recordings," both categories are
    subject to protection under the Copyright Act. *See* 17 U.S.C. § 102. Though there are differences in
    the exclusive rights granted by the Copyright Act to a copyright owner of "musical works" versus
    "sound recordings," such differences do not affect the analysis herein.

1   Defendant's wrongful conduct, Plaintiff has suffered damages.  Docket No. 26 (SAC ¶¶ 20-21).

2        Having not received a response from Defendant to her SAC, Plaintiff filed a request with the

3   Clerk to enter default, which was entered by the Clerk on March 26, 2010.  Docket No. 34.  On June

4   9, 2010, Plaintiff filed the instant Motion seeking default judgment only as to her First Cause of

5   Action for copyright infringement under 17 U.S.C. § 501, and limiting the relief sought to actual

6   damages under 17 U.S.C. § 504 (b), in the form of "lost artist royalties" and "mechanical royalties."

7   Docket No. 39 (Mot. at 2:5-10); Docket No. 49 (Supp. Brief at 2:19-21).

8        The Court notes that Plaintiff was ordered to file three supplemental declarations in support

9   of her Motion for Default.  *See* Docket No. 48; Docket No. 51; Docket No. 57.  Plaintiff was also

10   required to serve Defendant with a copy of the Court's orders regarding the submission of

11   supplemental evidence and providing notice of the December 9, 2010 hearing and its scope

12   (including the fact that additional evidence which was not part of the pleadings would be subject to

13   further examination by the Court at the default hearing).  *See* Docket No. 48; Docket No. 51.

14   Moreover, Plaintiff was ordered to serve Defendant with her subsequent submissions of evidence.

15   *See* Docket No. 48; Docket No. 51; Docket No. 57.  Plaintiff served Defendant accordingly.  *See*

16   Docket No. 53 (proof of service); Docket No. 55 (same); Docket No. 62 at 5 (same).  Defendant did

17   not submit any form of opposition and has not made an appearance in this action.

18                   **II.  ANALYSIS**

19        When entry of default judgment is sought, the court has an affirmative duty to look into its

20   jurisdiction over both the subject matter and the parties.  *In re Tuli*, 172 F.3d 707, 712 (9th Cir.

21   1999).  In addition, a court must "assess the adequacy of the service of process on the party against

22   whom default judgment is requested."  *Board of Trustees of the N. Cal. Sheet Metal Workers v.*

23   *Peters*, No. C-00-0395 VRW, 2000 U.S. Dist. LEXIS 19065, at *2 (N.D. Cal. Jan. 2, 2001).

24   Because default judgments generally are disfavored, courts have required "strict compliance with the

25   legal prerequisites establishing the court's power to render the judgment."  *See Varnes v. Local 91,*

26   *Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1369 (11th Cir. 1982).  The Court will therefore address

27   the issues of subject matter jurisdiction, personal jurisdiction, and service of process before

28   examining the merits of Plaintiff's motion.

**United States District Court**
For the Northern District of California

**A.    Subject Matter Jurisdiction**

Plaintiff's SAC alleges copyright ownership and infringement under 17 U.S.C. § 501 and seeks damages under 17 U.S.C. § 504.  Thus, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338 (a).  *See Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 284 (9th Cir. 1997), *rev'd on other grounds by Feltner v. Columbia Pictures Tel., Inc.*, 523 U.S. 340 (1998).

**B.    Personal Jurisdiction**

Before deciding whether to enter default judgment, the Court must assess whether it may exercise personal jurisdiction over the Defendant.  *See In re Tuli*, 172 F.3d at 712 (raising issue of personal jurisdiction *sua sponte* is proper when considering motion for default judgment because judgment entered without personal jurisdiction over the parties is void).  Here, Plaintiff does not allege Defendant's state of incorporation or residence, but generally claims that Defendant "solicit[s], transact[s], and [is] doing business within the State of California."  *See* Docket No. 26 (SAC ¶ 4).  Plaintiff served the original complaint and the SAC on Defendant, upon its managing agent authorized to accept service, in Delaware.  *See* Docket No. 31 (Exh. A) ("Return of Service"); Docket No. 33 (proof of service).  Defendant therefore appears to be an out-of-state company.

Personal jurisdiction over a nonresident defendant may be founded on either general or specific jurisdiction.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004).  In this case, Plaintiff alleges only the existence of specific jurisdiction.  *See* Docket No. 49 (Supp. Brief at 1:26-2:9).  The Ninth Circuit has set forth a three-pronged test to determine whether a party is susceptible to specific personal jurisdiction:

> (1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3)    the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Brayton Purcell, LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (citation omitted).

4

**United States District Court**
For the Northern District of California

1. **Purposeful direction**

Where the underlying action is the tort of copyright infringement, the first prong of the specific jurisdiction test is satisfied by showing "purposeful direction," as opposed to the "purposeful availment" analysis more commonly used in suits sounding in contract. *See Brayton Purcell*, 606 F.3d at 1128. "Purposeful direction" is evaluated using the three-part test taken from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *Brayton Purcell*, 606 F.3d at 1128 (citation omitted). Under the *Calder* effects test, the defendant allegedly must have: (a) committed an intentional act; (b) expressly aimed at the forum state; and (c) causing harm that the defendant knows is likely to be suffered in the forum state. *Brayton Purcell*, 606 F.3d at 1128 (citation omitted). To satisfy this test, the defendant need not have any physical contacts with the forum. *Id.* (citation omitted). Moreover, a showing that a defendant purposefully directed his conduct toward a forum state "usually consists of evidence of defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Schwarzenegger*, 374 F.3d at 803.

Here, Plaintiff has sufficiently alleged that Defendant committed an "intentional act" by "reproducing, distributing and/or publicly displaying [Plaintiff's registered musical] works without proper approval or authorization of Plaintiff." Docket No. 26 (SAC ¶ 15). According to Plaintiff, the Defendant "knew the infringed works belonged to Plaintiff and that [Defendant] did not have permission to exploit Plaintiff's works." *Id.* (SAC ¶ 16). This is sufficient to constitute an intentional act. *See Brayton Purcell*, 606 F.3d at 1128 (construing "'intent'...as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act") (citation omitted).

Next, Plaintiff has sufficiently alleged that Defendant's conduct was expressly aimed at California. Plaintiff has alleged the following: Defendant knew that Berkeley, California is Plaintiff's principal place of business;[3] Defendant willfully and unlawfully reproduced and distributed musical works that Defendant knew were owned by Plaintiff; and Defendant was aware

---

[3] Plaintiff attested at the December 9, 2010 hearing that her recording label, Mistletoe Music, is incorporated in California.

**United States District Court**
For the Northern District of California

1   that such infringement was likely to cause harm in California. Docket No. 26 (SAC ¶¶ 4, 10, 14-16,

2   18-19). In addition to alleging that Defendant solicits, transacts, and does business in California, *see*

3   Docket No. 26 (SAC ¶ 4), Plaintiff further attested at the December 9, 2010 hearing that Defendant

4   illegally sold her infringed musical works to consumers in California, including through stores such

5   as WalMart, Barnes & Noble, and Amazon.com. The Court finds that these allegations satisfy

6   "express aiming" by establishing that Defendant individually targeted Plaintiff and her business in

7   California. *See Brayton Purcell*, 606 F.3d at 1129-30 (express aiming satisfied in copyright

8   infringement case where Defendant knew Plaintiff's business was located in Northern California,

9   targeted Plaintiff's business, and directly competed with Plaintiff because Defendant was aware its

10  infringing website likely would be seen by Northern California residents); *Mattel, Inc. v. MCA*

11  *Records,* Inc., 296 F.3d 894, 899 (9th Cir. 2002) (finding defendants' conduct expressly aimed at

12  California where pop music song from Europe was distributed in the United States including

13  California, plaintiff's principal place of business); *IO Group, Inc. v. Jordon*, 708 F. Supp. 2d 989,

14  995 (N.D. Cal. 2010) (finding defendant's actions were expressly aimed at California because

15  defendant knew plaintiff maintains its principal place of business in California).

16         Finally, based on Plaintiff's allegations, the Court finds that Defendant caused harm that it

17  knew was likely to be suffered in California. This last element of the *Calder* effects test is satisfied

18  when a defendant's intentional act has "foreseeable effects" in the forum state. *Brayton Purcell*, 606

19  F.3d at 1131. In this case, as alleged by Plaintiff, it was foreseeable that she would suffer harm,

20  including financial losses, from Defendant's unauthorized reproduction and distribution of her

21  musical works. *See* Docket No. 26 (SAC ¶¶ 20-21). Furthermore, it was foreseeable that some of

22  this harm would occur in California, Plaintiff's place of residence which Defendant allegedly knew

23  was her principal place of business. *See id.* (SAC ¶¶ 1,10); *Brayton Purcell*, 606 F.3d at 1131

24  (foreseeable that harm of copyright infringement would occur in forum state where plaintiff was

25  known to reside). Thus, Plaintiff has sufficiently shown that Defendant purposefully directed its

26  activity at California.

27

28

### 2.    "Arises out of" Defendant's forum activities

Under the second prong of the specific jurisdiction analysis, the plaintiff's claims must "arise out of" the defendant's forum-related activities.  *Panavision Int'l, LP v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).  In the Ninth Circuit, this requirement is met if the plaintiff would not have been injured "but for" the defendant's forum-related conduct.  *Id.*  Here, Plaintiff has sufficiently demonstrated that Plaintiff would not have been injured, and her claim against Defendant would not have arisen, "but for" Defendant's copyright infringement directed toward her in California, her principal place of business.  *See Brayton Purcell LLP v. Recordon & Recordon*, 361 F. Supp. 2d 1135, 1142-43 (N.D. Cal. 2005) (factor was "easily met" where defendant's copyright infringement "reached into this District" and "affected [the plaintiff] in this District"), *aff'd on other grounds*, 606 F.3d 1124 (9th Cir. 2010).  Thus, the Court finds that Plaintiff has satisfied this requirement.

### 3.    Fair play and substantial justice

The final prong of the test for specific jurisdiction assesses whether the exercise of personal jurisdiction comports with fair play and substantial justice – i.e., whether it is reasonable.  *Brayton Purcell*, 606 F.3d at 1128.  To determine whether the exercise of jurisdiction over a nonresident defendant comports with fair play and substantial justice, a court should balance the following factors: (1) the extent of defendant's purposeful interjection into the forum state; (2) the burden on defendant of defending in the forum; (3) the extent of conflict with the sovereignty of defendant's state; (4) the forum state's interest in adjudicating the suit; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  *See Core-Vent Corp. v. Nobel Indus.*, 11 F.3d 1482, 1487-88 (9th Cir. 1993).  No single factor is dispositive.  *Id.* at 1488.  Moreover, upon a showing that the defendant purposefully directed its activities at forum residents, a presumption of reasonableness exists "which the defendant bears the burden of overcoming by presenting a compelling case that jurisdiction would be unreasonable."  *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986).

In the case at bar, Defendant has not made an appearance and therefore has not set forth any argument, let alone a compelling case, to overcome the presumption of reasonableness.

**United States District Court**
For the Northern District of California

1    Furthermore, taking the *Core-Vent* factors into consideration, the Court finds that on balance, they

2    weigh in favor of exercising personal jurisdiction over Defendant.  First, because Plaintiff is a

3    California resident, California has a strong interest in adjudicating this dispute.  *See Microsoft Corp.*

4    *v. Very Competitive Computer Prods. Corp.*, 671 F. Supp. 1250, 1256 (N.D. Cal. 1987) (California

5    had strong interest in resolving dispute where California plaintiff alleged copyright infringement by

6    Taiwanese defendants); *Jordon*, 708 F. Supp. 2d at 996 (California had strong interest in protecting

7    plaintiff company which was headquartered in California).  Second, nothing in the record establishes

8    that it would be burdensome for Defendant to defend against this lawsuit in California.  Third,

9    because Plaintiff's claims arise under federal copyright law, the exercise of jurisdiction in California

10   does not implicate sovereignty concerns of Defendant's state of residence.  None of the remaining

11   *Core-Vent* factors in the aggregate outweigh the reasonableness of exercising personal jurisdiction

12   over Defendant.  In sum, the Court finds specific jurisdiction over Defendant exists in this action.

13   **C.      Service of Process**

14          Next, the Court must determine whether Plaintiff effected proper service of process on

15   Defendant.  It is fundamental that "[b]efore a federal court may exercise personal jurisdiction over a

16   defendant, the procedural requirement of service of summons must be satisfied."  *Omni Capital*

17   *Int'l., Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987), *superseded by statute on other grounds*,

18   Futures Trading Practices Act of 1992, Pub. L. No. 102-546, § 211, 106 Stat. 3590, 3607-08 (1992).

19          Rule 4(h) of the Federal Rules of Civil Procedure allows for two methods of service on

20   domestic corporations.  One method of service on a corporation is by "delivering a copy of the

21   summons and of the complaint to an officer, a managing or general agent, or any other agent

22   authorized by appointment or by law to receive service of process...."  Fed.R.Civ.P. 4 (h)(1)(B).

23   Such "delivery" must be by personal service.  *See In re TFT-LCD*, Nos. M 07-1827 SI, C 09-1115

24   SI, MDL. No. 1827, 2009 WL 4874872, at *2 (N.D.Cal. Oct. 6, 2009).  Alternatively, a plaintiff may

25   serve a defendant corporation by following the law of the state where the district court is located or

26   of the state where service is made.  *See* Fed.R.Civ.P. 4 (h)(1)(A) (referring to Rule 4 (e)(1), which

27   provides for service pursuant to state law).  Under California law, a summons may be served on a

28   corporation by delivering a copy of the summons and the complaint "[t]o the person designated as

United States District Court

For the Northern District of California

1  agent for service of process," or "[t]o ...a general manager, or a person authorized by the corporation

2  to receive service of process." Cal. Code Civ. Proc. § 416.10 (a), (b).

3      Here, Plaintiff effected service of the original complaint and summons by process server in

4  Delaware on Melissa Wheeler, the "Managing Agent duly authorized to accept service." *See* Docket

5  No. 31 (Exh. A) ("Return of Service").[4]  Thus, service of the original complaint was proper under

6  either Fed.R.Civ.P. 4 (h)(1)(B) or Cal. Code Civ. Proc. § 416.10 (a) or (b).  Plaintiff also effected

7  service of the SAC by personal delivery to Melissa Wheeler.  *See* Docket No. 33.  Under the Federal

8  Rules, service of the SAC was not required, as Defendant has not made an appearance and the SAC

9  did not state new claims for relief against Defendant.  *See* Fed.R.Civ.P. 5 (a)(2); *Employee Painters'*

10 *Trust v. Ethan Enter., Inc.*, 480 F.3d 993, 999 (9th Cir. 2007).  Thus, the Court finds that service of

11 the complaint upon Defendant was proper.

**D.      Merits on Motion for Default Judgment**

12

13     A court may award a default judgment where the Clerk has previously entered the

14 defendant's default based upon a failure to plead or otherwise defend against an action.[5]

15 Fed.R.Civ.P. 55 (b)(2); *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal.

16 2002).  Upon entry of default, the factual allegations of the complaint are accepted as true, except

17 those relating to the amount of damages.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18

18 (9th Cir. 1987).  "The district court's decision whether to enter a default judgment is a discretionary

19 one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (citations omitted).  Factors that a

20 court may consider in exercising this discretion include: (1) the possibility of prejudice to the

21 plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the

22 sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6)

23 whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal

24 _____

25     [4] Plaintiff's counsel clarified in supplemental briefing that the proof of service dated
November 10, 2009, as indicated on its face, is the proof of service of the original complaint and
26 summons.  Plaintiff had mistakenly stated in her request to the Clerk to enter default that the
November 10, 2009 proof of service was for the FAC.

27     [5] Certain limitations exist on awarding default judgment against an infant, incompetent
person, or person in the military.  *See* Fed.R.Civ.P. 55 (b)(2); 50 U.S.C. App. § 521.  Plaintiff
28 adequately has set forth that those circumstances are not present here.

**United States District Court**
For the Northern District of California

Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). After considering the *Eitel* factors, the Court finds that the majority of factors weigh in favor of default judgment.

### 1.    <u>Possibility of prejudice to Plaintiff</u>

Under the first *Eitel* factor, the Court concludes that Plaintiff will be prejudiced if the Court denies Plaintiff's request for default judgment. By defaulting, Defendant is deemed to have admitted the truth of Plaintiff's allegations that her musical works were infringed by Defendant. *See TeleVideo Sys.*, 826 F.2d at 917-18. Without entry of default judgment, Plaintiff would be denied the right to judicial resolution of her claim and would likely be without recourse to recover monetary relief to which she is entitled under the Copyright Act for the harm and damages Defendant has caused. *See, e.g.*, *Jordon*, 708 F. Supp. 2d at 997.

### 2.    <u>Sufficiency of complaint and likelihood of success on the merits</u>

The second and third *Eitel* factors "require that a plaintiff state a claim on which the [plaintiff] may recover." *Philip Morris U.S.A., Inc. v. Castworld Products, Inc*., 219 F.R.D. 494, 499 (C.D. Cal. 2003) (citation omitted) (alteration in original). Here, Plaintiff has adequately alleged a claim for copyright infringement under the Copyright Act.

In the Ninth Circuit, in order to establish a *prima facie* case of copyright infringement, a plaintiff must show two elements: (1) ownership of the allegedly infringed material; and (2) the alleged infringer's violation of at least one exclusive right granted to the copyright holder under section 106 of the Copyright Act. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Before discussing each element, the Court will first address the preliminary issue of whether Plaintiff's musical works – which she alleges were first published, recorded, and registered to her in the United Kingdom – are subject to protection under the Copyright Act.

### a.    <u>Protection of foreign works under the Copyright Act</u>

Section 501 of the Copyright Act provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled, *subject to the requirements of section 411*, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501 (b) (emphasis added). Section 411 generally requires preregistration or registration

**United States District Court**
For the Northern District of California

of the copyright claim as a prerequisite to a civil suit for copyright infringement of "any United States work." *See* 17 U.S.C. § 411 (a).  Thus, section 411 imposes a "precondition" to filing a claim under the Copyright Act.  *See Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1247 (2010).

However, an exception to this precondition exists for foreign works; section 411 "expressly *allows* courts to adjudicate infringement claims involving unregistered works...where the work is not a U.S. work...."  *See Reed Elsevier*, 130 S. Ct. at 1246 (emphasis in original).  Specifically, "[n]o proof of registration is required if the work for which the plaintiff seeks protection has been authored in a foreign country covered by an applicable Convention."  *Montblanc-Simplo GmbH v. Colibri Corp.*, 692 F. Supp. 2d 245, 256 (E.D.N.Y. 2010) (citations omitted) (alteration in original); *see also Master Sound Int'l, Inc. v. Polygram Latino U.S.*, No. 98 Civ. 8468 (DLC), 1999 WL 595661, at *2 (S.D.N.Y. Aug. 6, 1999) (proof of registration is not prerequisite for bringing copyright claim in federal court if the work originated in a country outside the United States that is a signatory to the Berne Convention).  Such situations include where "the work is first published... in a foreign nation that, on the date of first publication, is a treaty party" or "the work is a sound recording that was first fixed in a treaty party."  *See* 17 U.S.C. §§ 104 (b)(2) and (b)(3).

Thus, for present purposes, Plaintiff may seek protection of her musical works under the Copyright Act, without proof of United States registration, if her works were first "published"[6] or first "fixed"[7] in a "treaty party."[8]  *See generally*, 3 Paul Goldstein, Goldstein on Copyright § 18.4 at 18:21-22 (3d ed. 2010) ("[s]ection 104...provides the general framework for protection of foreign works in the United States"; "[t]he determination of whether the...Copyright Act protects a work of foreign origin must be made against the background of the laws and treaties in force at the time the

---

[6]  The Act defines "publication" as in part, the "distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 101.

[7]  According to the Act, "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."  17 U.S.C. § 101.

[8]  Under the Act, a "treaty party" is "a country or intergovernmental organization other than the United States that is a party to an international agreement[,]" such as the Berne Convention, the Universal Copyright Convention, or the Geneva Phonograms Convention.  17 U.S.C. § 101.

11

United States District Court

For the Northern District of California

work was first published"); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §

5.09[A][2] at 5-78 (2010) ("a foreign claimant who can show that his nation has a bilateral copyright

treaty with the United States, for example, or adheres to the Universal Copyright Convention, would

seem to have established all that is required to obtain protection for his sound recordings").

In her Second Supplemental Declaration in support of her Motion for Default, Plaintiff

attests as follows: the four musical works at issue were first published in the United Kingdom; they

were originally performed by Plaintiff in Scotland as part of the production of an album, which was

recorded in Scotland in 1994 and 1995; this album was released in March 1995; and the United

Kingdom is a party to the Berne Convention.  *See* Docket No. 54 (Second O'Reilly Supp. Decl. ¶¶ 2-

4).  At the December 9, 2010 hearing, Plaintiff further clarified that the recording of her four songs

in Scotland in 1994 and 1995 was the first time they were recorded, or "fixed," and the 1995 album

release in the United Kingdom was the first time her four songs were distributed for sale to the

public.  The United Kingdom became a "treaty party" to several copyright conventions well before

Plaintiff's claimed dates of fixation and publication, including the Berne Convention, the Universal

Copyright Convention (Geneva and Paris), and the Geneva Phonograms Convention.[9]  Furthermore,

the United States adhered to the foregoing conventions prior to the dates when Plaintiff attests her

works were first fixed and published.[10]

Therefore, the Court finds that Plaintiff has adequately alleged the musical works for which

she claims protection were first "published" or "fixed" in the United Kingdom, a treaty party to

numerous copyright conventions to which the United States also adheres.  Her allegations are

sufficient to trigger protection of her foreign works under the Copyright Act.

---

[9]   The United Kingdom became a treaty party to the Berne Convention in 1887; to the Universal Copyright Convention, Geneva and Paris, in 1957 and 1974, respectively; and to the Geneva Phonograms Convention in 1973.  *See* 9 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, App. 20, at 20-11 (2010) (reprinting *International Copyright Relations of the United States Circular 38a* (United States Copyright Office, July 2009)).

[10]   The United States joined the Berne Convention in 1989; the Universal Copyright Convention, Geneva and Paris, in 1955 and 1974, respectively; and the Geneva Phonograms Convention in 1974.  *See* 9 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, App. 20, at 20-2 (2010) (reprinting *International Copyright Relations of the United States Circular 38a* (United States Copyright Office, July 2009)).

United States District Court

For the Northern District of California

### b.     Ownership

When a foreign work is allegedly infringed in the United States, copyright ownership is decided according to the law of the country which has the closest relationship to the work, while United States law applies to determine whether infringement has occurred and if so, what remedies are available.  *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 84, 90-91 (2d Cir. 1998).[11]  In determining which country has the closest relationship to the work, courts have considered the nationality of the author and the place of initial creation or publication as relevant factors.  *See, e.g.*, *Itar-Tass*, 153 F.3d at 90-91 (Russian law determines issues of copyright ownership where works at issue were created by Russian nationals and first published in Russia); *Entral Group Int'l, LLC v. Honey Cafe on 5th, Inc*., No. 05 CV 2290 NGG MDG, 2006 WL 3694584, at *4 (E.D.N.Y. Dec. 14, 2006) (Chinese law applies to issue of ownership where alleged works were created in Hong Kong, presumably by Chinese authors, and first published in Hong Kong); *Lahiri v. Universal Music & Video Distribution, Inc*., 513 F. Supp. 2d 1172, 1176 n.4 (C.D. Cal. 2007) (India's copyright laws applied to determine copyright ownership where work was created in India).

Here, the law of the United Kingdom determines copyright ownership since the United Kingdom has the closest relationship to the works at issue; Plaintiff, an Irish citizen, claims her musical works were first published and fixed in the United Kingdom.  To this end, Plaintiff also alleges in her SAC that her four musical works are registered to her in Ireland and has attached as an exhibit to her SAC copies of registration certificates in her name.[12]  *See* Docket No. 26 (SAC  ¶ 8, Exh. A).  Plaintiff further attests that she registered her musical works with the Publishing Rights Society of the United Kingdom, where she was informed by the Musicians' Union to register her songs.  *See* Docket No. 49 (O'Reilly Supp. Decl. ¶ 3); Docket No. 54 (Second O'Reilly Supp. Decl. ¶

---

[11]    The Ninth Circuit has not squarely addressed this choice of law question.  The Court notes that the issue of whether United States copyright law applies to all elements of a copyright infringement action involving foreign works has been the subject of scholarly debate and disagreement.  *See* Binyomin Kaplan, *Determining Ownership of Foreign Copyright: A Three-Tier Proposal*, 21 Cardozo L. Rev. 2045, 2058-62 (May 2000).

[12]    Some of the registration certificates are under the name "Meriel Bernice Hilda O'Reilly," which Plaintiff attests is her given name.  *See* Docket No. 49 (O'Reilly Supp. Decl. ¶ 4).

United States District Court

For the Northern District of California

2).  The Court finds that Plaintiff's allegations, taken as true, are adequate to allege that she owns the musical works at issue in the United Kingdom, and therefore that Plaintiff has satisfied the element of ownership.  *See Entral Group*, 2006 WL 3694584, at *4 (sufficient to allege works created in Hong Kong were "protected under Chinese law" in order to establish ownership rights for copyright infringement claim on default judgment); *Master Sound Int'l*, 1999 WL 595661, at *2 (plaintiff's allegation that foreign compositions were protected under Mexican law coupled with adequate identification of compositions at issue sufficient to withstand motion to dismiss copyright claim; court need not determine requirements of Mexican law to resolve motion).  *See generally Jordon*, 708 F. Supp. 2d at 997-98 (on default judgment, plaintiff's allegation that it owned registered copyrights in photographic and audiovisual works taken as true and found sufficient to plead ownership element of copyright infringement claim); *Elektra Entm't Group, Inc. v. Bryant*, No. CV 03-6381GAF(JTLX), 2004 WL 783123, at *3 (C.D. Cal. Feb. 13, 2004) (on default judgment, element of ownership satisfied where plaintiffs provided a list of many but not all copyrighted sound recordings allegedly subject to valid certificates of copyright registration, even though actual registration certificates were not provided).

            **c.      Violation of exclusive right**

        Here, United States law determines whether Plaintiff's foreign works have been infringed.  *See Itar-Tass*, 153 F.3d at 91; *Entral Group*, 2006 WL 3694584, at *4.  Section 106 of the Copyright Act grants a copyright owner "the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords… [¶] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale…."  17 U.S.C. § 106.

        Plaintiff alleges that Defendant knew the four musical works at issue were registered to Plaintiff but willfully copied, distributed, and/or publicly displayed Plaintiff's works.  Docket No. 26 (SAC  ¶¶ 9, 11, 13-16, 18-19).  In support of her allegations, Plaintiff has also submitted a declaration attesting that Defendant wrongfully reproduced and distributed her copyrighted works on seven different musical albums.  Docket No. 39 (O'Reilly Decl. ¶¶ 2-5).  At the December 9, 2010 hearing, Plaintiff submitted copies of five of the seven albums containing reproductions of her musical works.  Plaintiff asserts that these acts of reproduction, distribution, and publication were

**United States District Court**
For the Northern District of California

and are unauthorized.  Docket No. 26 (SAC ¶¶ 14-16).  Accepting Plaintiff's well-pleaded allegations as true, the Court finds that Plaintiff has adequately alleged that Defendant violated exclusive rights granted to Plaintiff by the Copyright Act as the owner of the musical works at issue. *See Jordon*, 708 F. Supp. 2d at 998 (finding copyright infringement claim was adequately pled where plaintiff alleged that defendant reproduced, distributed and publicly displayed plaintiff's copyrighted work without authorization).

In sum, the Court finds that Plaintiff has met the second and third *Eitel* factors by sufficiently pleading the elements of a claim for copyright infringement under the Copyright Act.

### 3.       Sum of money at stake in the action

The fourth *Eitel* factor considers the amount of money at stake in relation to the seriousness of a defendant's conduct.  *PepsiCo*, 238 F. Supp. 2d at 1176.  "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in light of defendant's actions."  *Truong Giang Corp. v. Twinstar Tea Corp.*, No. C 06-03594 JSW, 2007 WL 1545173, at *12 (N.D. Cal. May 29, 2007) (citations omitted).  To determine whether the amount at stake is reasonable, the court considers a plaintiff's declarations, calculations, and other documentation of damages.  *Id*. Here, the amount of monetary relief sought is not disproportionate or unreasonable.  Plaintiff seeks actual damages, thus ensuring that the award corresponds to Plaintiff's actual injuries based on Defendant's infringement.  Accordingly, the Court finds this factor favors entry of default judgment.

### 4.       Possibility of dispute concerning material facts

Under the fifth *Eitel* factor, the Court assesses the likelihood of dispute between the parties regarding the material facts of the case.  Where a plaintiff has filed a well-pleaded complaint alleging the elements necessary to establish her claim, and the Clerk has entered default upon defendant's failure to answer, a court may find the possibility of a dispute as to material facts is unlikely.  *See Capitol Records v. Barrera*, No. C 06-07212 JSW, 2007 WL 1113949, at *3 (N.D. Cal. April 13, 2007); *Elektra Entm't Group, Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005). Here, Defendant has failed to appear and respond to the original or second amended complaint, and the Clerk has entered default accordingly.  Because Plaintiff's well-pled allegations, except as to the amount of damages, are presumed to be true, *TeleVideo*, 826 F.2d at 917-18, Plaintiff has adequately

United States District Court

For the Northern District of California

alleged her copyright infringement claim against Defendant, as set forth above.  Moreover, Defendant was served with a copy of the order setting the December 9, 2010 hearing on Plaintiff's Motion for Default and with Plaintiff's supplemental briefing and declarations in support.  *See* Docket No. 51 (Order re Supplemental Evidence (setting hearing date)); Docket No. 53 (proof of service); Docket No. 55 (proof of service); Docket No. 62 at 5 (proof of service).  Nevertheless, Defendant did not appear at the hearing on this matter or file any opposition to the Motion for Default or to Plaintiff's submission of supplemental evidence.  Accordingly, the record reflects Defendant's silence despite notice of the proceedings and several opportunities to respond. Therefore, the Court finds there is little possibility of a dispute concerning material facts as to Plaintiff's infringement claim.

### 5.    **Possibility of excusable neglect**

The sixth *Eitel* factor considers whether Defendant's failure to respond to Plaintiff's allegations was the result of excusable neglect.  *Compare Philip Morris*, 219 F.R.D. at 500-01 (possibility of excusable neglect remote where defendant received multiple notices regarding lawsuit, including notice of complaint and motion for default, but failed to answer complaint or oppose motion; extended period of time had elapsed; and defendant resisted settlement efforts), *with Eitel*, 782 F.2d at 1472 (excusable neglect apparent where defendant reasonably believed settlement had been reached and filed untimely answer soon after settlement agreement dissolved).  As noted above, Defendant was properly served with the summons and original complaint, as well as the SAC, notice of the default hearing, and supplemental briefing and evidence regarding Plaintiff's Motion for Default.  Moreover, an extended period of time has elapsed since Defendant was first notified of Plaintiff's copyright infringement claim.  Plaintiff's suit against Defendant was filed in August 2009.  However, Defendant has not appeared or responded in any manner.  Thus, the Court does not find evidence in the record to suggest that Defendant's default was the result of excusable neglect.

### 6.    **Policy of favoring decision on the merits**

The final *Eitel* factor examines whether the policy of favoring a decision on the merits precludes entry of default judgment.  *Eitel*, 782 F.2d at 1472 ("[c]ases should be decided on their

United States District Court

For the Northern District of California

merits whenever reasonably possible").  However, "the mere existence of Fed.R.Civ.P. 55 (b) indicates that this preference, standing alone, is not dispositive."  *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation and citation omitted).  Because Defendant has failed to defend against this action, a decision on the merits would be "impracticable, if not impossible."  *Truong Giang*, 2007 WL 1545173, at *13 (citation omitted).  Therefore, the Court finds this factor, though it weighs against default judgment, does not preclude granting it.  *See Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996).

In sum, based on a consideration of the *Eitel* factors, the Court recommends granting Plaintiff's Motion for Default Judgment.  The remaining issue is the amount of damages that should be awarded.

**E.    Damages**

Although the factual contentions of the operative complaint must be accepted as true when determining the liability of a defaulting defendant, this rule does not apply to statements regarding damages.  *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977).  A plaintiff must establish damages in default proceedings.  Federal Rule of Civil Procedure 55 (b)(2) authorizes a hearing in order to determine damages.  While a court is not obligated to hold such hearings, it may not simply rely on bare assertions; it must ensure the propriety of the damages sought.  *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997).

Plaintiff  pursues actual damages under 17 U.S.C. § 504 (b), which provides as follows:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

Plaintiff's actual damage claim has been somewhat of a moving target.  At first, Plaintiff asserted that she seeks actual damages in the form of lost artist and mechanical royalties, but that she did not intend to prove up damages in the form of infringer profits.  *See* Docket No. 39 (Mot. at 2:5-10).  Plaintiff subsequently changed course and expanded her damages claim to include

United States District Court

For the Northern District of California

Defendant's profits.  In a supplemental brief, she stated that "[s]ince Defendant has not appeared, and discovery cannot be done in a cost effective manner, it is not possible to specifically ascertain the profit.  Instead, Plaintiff relies on the Declaration of Al Evers, a music industry executive, who has not only estimated what Plaintiff's royalties would be, but has also provided sufficient information to determine the likely net profit from the sales of Plaintiff's tracks."  Docket No. 49 (Supp. Brief at 3:19-23).

In sum, Plaintiff appears to seek actual damages in the form of lost artist and mechanical royalties, as well as Defendant's profits attributable to the infringement, to the extent such profits do not overlap with the computation of actual damages.  *See* 17 U.S.C. § 504 (b).

### 1.   **Actual damages**

The first question is whether lost royalties properly may be awarded as actual damages pursuant to Section 504 (b).  The Ninth Circuit "define[s] the phrase 'actual damages' as 'the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement.'" *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002) (citing *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985)).  While the owner of an infringed work undoubtedly may suffer a monetary injury in the form of lost royalties, such losses do not necessarily reflect an injury to the market value of the work.  In other words, the fact that an artist did not receive royalties for use of a copyrighted song does not automatically result in an injury to the value of the song.

The issue of whether lost royalties or license fees may constitute Section 504 (b) damages has been the subject of some judicial and scholarly debate.  *See, e.g.*, *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164-72 (2d Cir. 2001).  However, the Ninth Circuit appears to have adopted the view that actual damages may be measured by "what a willing buyer would have been reasonably required to pay to a willing seller for [the owner's] work."  *Jarvis v. K2, Inc.*, 486 F.3d 526, 533-34 (9th Cir. 2007) (quoting *Frank Music Corp.*, 772 F.2d at 512) (internal quotation and citation omitted); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708-09 (9th Cir. 2004) (upholding jury award of actual damages in the form of lost license and renewal fees).  Such a standard would appear to encompass lost royalties.

In this case, Plaintiff argues that her actual damages should comprise two types of lost royalties – artist royalties and compulsory or "mechanical" royalties.

### a.   Artist royalties

Plaintiff seeks artist royalties for her work as the recording artist on the four songs in question.  At the December 9, 2010 hearing, Plaintiff testified that she is a singer and songwriter who has performed all over the world.  She testified that she is the principal of Mistletoe Music, a California-based recording label that has released five albums of her songs and performances.

In her original supporting declaration, Plaintiff attested that, "[b]ased on my knowledge of the recording industry as a performer and owner of my own company, Mistletoe Music, a typical performance royalty for an artist of my experience and caliber is 15% to 30%."  Docket No. 39 (O'Reilly Decl. ¶ 8).  Plaintiff did not state in her declaration whether this percentage range applied to gross or net sales, but went on to include calculations at 15% and 30% of the projected gross sales of her tracks on the infringing albums.  Plaintiff further attested that the average retail price for the infringing albums is $15 per album.  *See* Docket No. 39 (O'Reilly Decl. ¶ 6).

Plaintiff submitted sales tracking information from Soundscan, which she testified is considered to be the authoritative industry source for record sales information.  Plaintiff submitted the album names and barcodes for the infringing albums to Soundscan, and received the following information regarding number of albums sold:

*Celtic Mysteries*:   30,712

*Celtic Spirit*:   27,691

*Celtic Moods*:   8,900

*Celtic Lives*:   10,301

*Celtic Journeys*:   19,911[13]

---

[13]   Because Plaintiff was not able to provide a copy of *Celtic Journeys* to the Court, the Court questioned her at the December 9, 2010 hearing about which infringing track appears on that particular album.  Plaintiff testified that she believed it contained her performance of "Mo Bhron or an BhFarraige."  The Court independently verified the recordings on that album with internet resources by using the catalog number for that album as provided by Plaintiff.  The Court's research indicated that *Celtic Journeys* contains only one song by Plaintiff, entitled "This Place."  In Plaintiff's SAC, Plaintiff alleges that another defendant (Valley Entertainment), and not St. Clair, unlawfully reproduced and distributed "This Place."  Docket No. 26 (SAC ¶ 13).  Accordingly,

United States District Court

For the Northern District of California

*Celtic Sisters* (1998):  43,132

*Celtic Sisters* (2007):  10,358

*See* Docket No. 39 (O'Reilly Decl. ¶¶ 3-5).

At the December 9, 2010 hearing, the Court questioned Plaintiff about her own track record in obtaining artist royalties for her recordings.  Plaintiff testified that since most of her recordings have been on her own record label, she is not compensated through standard artist royalties for these works.  However, Plaintiff identified two record albums produced by other labels for which she negotiated artist royalties.  For her work on the album *Tir Na Mara*, released in Scotland in 1995, Plaintiff contracted for an artist royalty of 15% of the net sales.  In 1996, one of Plaintiff's performances appeared on a compilation album entitled *Celtic Woman*.  Plaintiff contracted for an artist royalty of 15% of the gross sales attributable to her particular track.  Unfortunately, Plaintiff never collected artist royalties for her work on either of these albums because the entities with which she contracted never paid her.

On this factual record, the Court finds that a reasonable artist royalty rate for the calculation of actual damages in this case is 15% of net sales attributable to her tracks, assuming a retail price of $15 per album, and a 20% reduction for costs, for a total of $23,060.22 in lost artist royalties:

| Album | No. of Tracks | No. of Tracks by Plaintiff | No. of Albums Sold | Net Sales at $15 Minus 20% Cost | Plaintiff's Portion of Net Sales | % Artist Royalty | Amount of Artist Royalties |
|-------|---------------|----------------------------|--------------------|---------------------------------|----------------------------------|------------------|----------------------------|
| Celtic Lives | 10 | 1 | 10,301 | $123,612 | $12,361.20 | 15% | $1,854.18 |
| Celtic Spirit | 10 | 1 | 27,691 | $322,292 | $33,229.20 | 15% | $4,984.38 |

Plaintiff's Motion for Default Judgment against St. Clair does not claim liability nor seek damages for infringement by St. Clair of the recording "This Place."  *See* Docket No. 39 (O'Reilly Decl. ¶ 2).

The Court provided Plaintiff with an opportunity to submit a supplemental post-hearing pleading to explain why she should be entitled to actual damages for the *Celtic Journeys* album.  *See* Docket No. 57.  Plaintiff's submission indicates that she had been mistaken about this fact when testifying from memory at the December 9, 2010 hearing.  *See* Docket No. 62.  For this reason, Plaintiff is not entitled to damages from sales of *Celtic Journeys*.

| Celtic Moods | 12 | 2 | 8,900 | $106,800 | $17,800.00 | 15% | $2,670.00 |
|---|---|---|---|---|---|---|---|
| Celtic Mysteries | 10 | 1 | 30,712 | $368,544 | $36,854.40 | 15% | $5,528.16 |
| Celtic Sisters ('98) | 12 | 1 | 43,132 | $517,584 | $43,132.00 | 15% | $6,469.80 |
| Celtic Sisters ('07) | 12 | 1 | 10,358 | $124,296 | $10,358.00 | 15% | $1,553.70 |
| TOTAL | | | | | | | $23,060.22 |

**b.     Mechanical royalties**

Plaintiff also seeks actual damages in the form of mechanical or compulsory royalties. Compulsory royalties are payable by makers and distributors of phonorecords to copyright owners of "a nondramatic musical work [that has] been distributed to the public in the United States under the authority of the copyright owner...."  17 U.S.C. § 115 (a)(1).  The rate of compulsory royalties is governed by statute.  *See* 17 U.S.C. 115 (c); 37 C.F.R. § 255.3.

Although Plaintiff seeks mechanical royalties for all four of the infringed recordings, Plaintiff testified that only one of her works, "Annie Moore,"  meets the prerequisite set forth in Section 115 (a) that it has been "distributed to the public in the United States under the authority of the copyright owner."  Although Plaintiff argued that she would have received mechanical royalties for the other recordings under the laws of the United Kingdom, she did not offer any legal authorities to support such royalties as an element of actual damages in this Court.  Thus, Plaintiff is entitled to mechanical royalties for "Annie Moore" in the amount of $ 1,261.87:

| *Song Title* | *Album Title* | *Song Length* | *Albums Sold* | *Mechanical Rate* | *Mechanical Royalties* |
|---|---|---|---|---|---|
| Annie Moore | Celtic Lives | 6:21 | 10,301 | 0.1225 | $1,261.87 |

In sum, the Court recommends that Plaintiff be awarded $23,060.22 in lost artist royalties and $1,261.87 in lost mechanical royalties, for a total of $24,322.09 in actual damages.

### 2. <u>Infringer profit damages</u>

Section 504 (b) authorizes a copyright owner to recover "profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." The Ninth Circuit requires a copyright owner to present evidence establishing a legally sufficient causal link between the infringement and a defendant's ill-gained profits. *See Mackie*, 296 F.3d at 915-16. "When an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner." *Polar Bear Prods.*, 384 F.3d at 711 (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.03 at 14-34 (2010)).

The sole evidence offered by Plaintiff in support of her claim for infringer profits is the Declaration of Al Evers, "an expert witness in the music industry." *See* Docket No. 49 (Supp. Brief at 3:26). Mr. Evers' declaration purports to calculate Plaintiff's artistic and mechanical royalties, as well as the infringer profits attributable to Defendant's unauthorized use of her musical works.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Furthermore, the Supreme Court has explained that "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" is to be performed by a court. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Mr. Evers offers three sentences to support his qualification as an expert witness:

> I am CEO of A-Train Entertainment, a music production business. I have personal knowledge of the facts set forth therein regarding music industry standards and practices and if called upon as a witness could and would testify competently thereto. I base this application on my own knowledge of the recording industry, having worked in that industry for twenty five years and negotiated many contracts with composers and performers of greater and lesser stature than Melanie O'Reilly.

Docket No. 50 (Evers Decl. ¶ 1).

This description is far too vague and meager for the Court to be able to evaluate whether Mr. Evers has sufficient knowledge, skill and experience in the area to qualify him to provide an expert

opinion in this matter.  For example, Mr. Evers does not state the nature of his work within the music industry, the number of contracts he has negotiated within the industry, or whether those contracts are even remotely similar to the types of contract terms he discusses in his declaration.  He does not state that he has ever met Plaintiff, listened to her recordings, or has any foundational familiarity with her experience or the caliber of her work as a musical composer or performer.  Nor does he describe any relevant lectures, publications, other experience or prior work as an expert in this field that might support his qualification as an expert in this matter.  For this reason, Mr. Evers' declaration fails to meet the standards set forth in Rule 702, and cannot be considered by this Court. Since Mr. Evers' declaration was the sole evidence offered in support of a lost profits award, Plaintiff cannot meet her burden of establishing a claim for infringer profits.

## III.  <u>RECOMMENDATION</u>

For the foregoing reasons, the Court recommends the following:

1) Plaintiff's Motion for Default Judgment against Defendant St. Clair be GRANTED as to her First Cause of Action for copyright infringement under 17 U.S.C. § 501.

2) The Clerk be directed to enter judgment for Plaintiff against Defendant in the amount of **$24,322.09** in actual damages.

Any party may serve and file specific written objections to this report and recommendation with the District Judge within 14 days after being served with a copy.  *See* 28 U.S.C. § 636 (b)(1); Fed.R.Civ.P. 72 (b); Civ.L.R. 72-3.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.

Dated: January 4, 2011

_____
DONNA M. RYU
United States Magistrate Judge